Williams, J.
The judgment of reversal announced after the first hearing of this case, was nol the unanimous decision of the, court, although no dissent appeared. The case having been more fully argued on the rehearing, and further considered by the court, is now for disposition as upon the original submission. The only question that has engaged the attention of counsel and the court on each of the hearings, is whether that provision of section 3461 *73 of the Revised Statutes, which confers jurisdiction on the probate court to direct the mode of constructing a telegraph or telephone line in the streets of a municipality when its authorities and the company are unable to agree, is repugnant to the constitution of the state; and the sole ground of the attack upon the constitutionality of the provision alluded to, is that the power it purports to confer on'the court is purely legislative in character. It is a sound proposition that the distribution of the powers of the state, by the constitution, to the legislative, executive, and judicial departments, operates, by implication, as an inhibition against the imposition upon either, of those powers which distinctively belong to one of the other departments. But in classifying those powers and determining to which class various powers created by statute exclusively or properly belong, difficulties are encountered, and many nice distinctions have been made. If the power here in question is such that it can be conferred on any judicial tribunal, there can be no doubt of the cax>acity of the probate court to receive and exercise it, by virtue of the constitutional provision which enables that court to take any jurisdiction, in any county, which the legislature may confer upon it. Section 8, article 4. The statutory provisions which may aid in a determination of the nature of the power involved in this controversy, are those contained in sections 3454, 3461-1, 3471, and sections 3456, 3457, 3458, 3459 and 3461 of the Revised Statutes. These sections provide as follows:
Section 3454. “A magnetic telegraph company heretofore or hereafter created may construct telegraph lines, from point to point, along and upon any public road, by the erection of the necessary fixtures, *74 including posts, piers, and abutments necessary for the wires; but the sáme shall not incommode the public in the use of such road.”
Section 3461-1. “Any person or persons may be and are hereby authorized to construct lines of electric telegraphs, from point to point, upon and along any of the public roads and highways, and across any of the waters within the limits of this state, by the erection of the necessary fixtures, including posts, piers, or abutments for sustaining the cords or wires of such lines; provided, that the same shall not in any instance be so constructed as to incommode the public in the use of said roads or highways, or endanger or injuriously interrupt the navigation of said waters; nor shall this act be so construed as to authorize the erection of any bridge across any of the waters of this*state.”
Section 3471. “The provisions of this chapter shall apply also to any company organized to construct any line or lines of telephone; and every such company shall have the same powers and be subject to the same restrictions, as are herein prescribed for magnetic telegraph companies.”
Section 3456. “Any such company may enter upon any land, whether held by an individual or a corporation, and whether acquired by purchase or appropriation, or in virtue of any provision in its charter, for the purpose of making preliminary examinations and surveys, with a view to the location and erection of lines of magnetic telegraph, and may appropriate so much thereof as may be deemed necessary for the erection and maintenance of its telegraph poles, piers, abutments, wires, and other necessary fixtures, and for stations, and the right of way *75 over such lands and adjacent lands sufficient to enable it to construct and repair its lines.”
Section 3457. “No such company shall, without the consent of the owner thereof, in writing, enter a building or edifice, or use or appropriate any part thereof, or erect any telegraph pole, pier, or abutment in any yard or inclosure within which an edifice is situate, nor, in cases not provided for in section three thousand four hundred and sixty-one, erect any telegraph pole, pier, abutment, wires, or other fixtures, so near to any edifice as to occasion injury thereto, or risk of injury, in case such pole, pier, or abutment be overthrown, nor injure or destroy any fruit or ornamental trees.”
Section 3458. “When lands sought to be appropriated for lines of magnetic telegraph are held by a corporation incorporated under any law of this state, whether held by purchase or in virtue of any appropriation authorized by its charter or by any law of this state, the right of the company to appropriate such lands shall be limited to such use of the same as shall not, in any material degree, interfere with the practical uses to which the company is authorized to put such lands under its charter; and no such company shall erect poles, piers, abutments, wires, or other necessary fixtures, in such close proximity to any other .line of magnetic telegraph authorized by law to be constructed as to interfere mechanically with the practical working of such telegraph.”
Section 3459. “The right of such company to use lands held by a railroad company, for the permanent structures of such telegraph, shall be limited to the land which lies within five feet of the outer limits of the right of way of the railroad company, where it is practicable to erect the line within those limits; when *76 the company seeks to appropriate lands that lie beyond those limits, its petition must set forth the facts showing that it is impracticable to erect such line within said limits, and designate, either by a survey and map, or by reference to monuments, or by other means of easy identification, the place or places Avhere the company 'seeks to establish the line; the probate court shall, in all instances, determine, if it be controverted by the railroad company, whether the erection of the line at the place or places designated will, in any material degree, interfere with the practical uses to which such railroad company is authorized to put such land; and if the court is satisfied that it Avill so interfere, it shall reject the petition, or require the structure to be erected at such .other place or places as the court shall direct; but nothing in this chapter shall be so construed as to authorize any company to appropriate the use of the track or rolling-stock of any railroad company for the purpose of transporting poles, materials, or the employes of such telegraph company, or for any other purpose Avhatever.”
Section 3461. “When any lands authorized to be appropriated to the use of a company are subject to the easement of a street, alley, public, way, or other public use, within the limits of any city or village, the mode of use shall be such as shall be agreed upon between the municipal authorities of the city or village and the company; and if they can not agree, or the municipal authorities unreasonably delay to enter into any agreement, the probate court of the county, in a proceeding instituted for the purpose, shall direct in Avhat mode such telegraph line shall be constructed along such street, alley, or public way, so as not to incommode the public in the use of the *77 same; but nothing in this section shall be so construed as to authorize any municipal corporation to demand or receive any compensation for the use of a street, alley, or public way, beyond what may be necessary to restore the pavement to its former state of usefulness.”
It may be observed, at the outset, that the effect of section 3471, is to place telephone companies on the same footing as telegraph companies, so that when the latter kind of company is mentioned in the other sections of the statute, the former is also included. And that, under sections 3454 and 3461-1, companies of either kind, when created, obtain from the state, franchises to construct and maintain their lines, from point to point, upon and along any public road or highway, and across any of the waters, within the state, by the erection of the necessary fixtures, including posts, piers, and abutments necessary for sustaining the cords or wires for such lines, subject only to the limitation that the' lines shall not be so constructed as to incommode the public in the use of the roads, and highways, or endanger or injuriously interrupt navigation. In order that such companies may fully enjoy the franchises thus granted them by the state, they are clothed, by section 3456, with the authority to appropriate any lands of individuals or corporations that are deemed necessary by the companies for the erection and maintenance of their poles, piers, abutments, wires, and other appliances, and the right of way over adjacent lands sufficient to enable them to construct anct repair their lines. But this right of appropriation of private property for the use of such companies is subject to certain limitations prescribed in the subsequent sections, one of which, contained in section *78 3457, forbids the appropriation or mse by such company, without the owner’s consent, of any yard or enclosure within which an' edifice is situated, or the erection of any pole or structure so near to any edifice as to occasion injury or risk of injury thereto, or so that it will injure or destroy any fruit or ornamental tree. Another limitation, which is contained in section 3458, restricts the right of the company in the appropriation of lands held by another corporation, to such use of the same as will not in any material degree interfere with the practical use which the other corporation is authorized by its charter to make of such lands; and, it forbids the construction of the company’s line in such close proximity to another such line as to interfere, mechanically, with the practical working of the latter. By section 3459, a restriction is imposed on the right of appropriation of property held by railroad companies, to the effect that there shall not be taken for any permanent structure, any part of the railroad right of way that lies more than five feet from its outer limits, where it is practicable to construct the telephone or telegraph line within those bounds; and if it be claimed that is impracticable, the appropriation petition must state the facts showing it to be so. When the petition is controverted, the probate court is required, in all instances, to determine whether the line at the place jjroposed will, in any material degree, interfere with the practical uses which the railroad company is authorized to make of its right of way, and if satisfied it will so interfere, the court is empowered to reject the petition, or to require the telephone poles or structures to be erected at such other place or places as the court may direct. It may be well to notice here the nature of the power conferred on the probate *79 court by this provision of the statute; for it is obvious that it is not different in nature from the power conferred by section 3461. It is essential that the rights of the two corporations, each holding separate franchises from the state, with respect to the uses which each are claiming of the same property, should be so adjusted that both may be able to carry out the purposes of their creation, and neither defeated in their objects by the conduct of the other. To accomplish that result, some impartial tribunal must be clothed with the power to hear and determine, on proper application, what mode of use by each company of the same property will enable both companies to carry on their business without obstruction by the other. Where, it may be asked, could that power be more appropriately lodged than in the tribunal in which the appropriation proceeding is had? And, can it be any the less judicial in its nature because exercised by the court in the first instance, than it would be if resort were had to a court of equity to settle the dispute, after actual conflict between the two companies had arisen" If it is a judicial function to direct where the poles of a telephone line shall be placed in order to prevent interference with the proper use of a railway, it must be equally so to direct the mode of construction of the line in other respects so as to accomplish the same result, or so as to avoid unnecessary obstruction to the use of a public street. It may be said that the proceeding under this provision of the statute does not involve the'exercise of any supervisory or administrative power belonging to municipal authorities. Neither does that under section 3461. That section makes provision for all further appropriation proceedings that are necessary to the complete enjoyment by the companies of their *80 franchises, by authorizing the condemnation of the easements appurtenant to property abutting on the public streets and ways, the owners of which are en-' titled to condensation for the new burden. And then follows the provision in question, designed, evidently, to furnish a competent tribunal, and provide a method of procedure, for the adjustment of any controversy between the company and the municipal authorities in regard to the mode of constructing the companies’ lines in the streets; that being the only remaining step necessary to enable the company to enter upon the full use of its franchises. The provision is that, “the mode of use” of the streets, “shall be such as-shall be agreed upon between the municipal authorities of the city or village, and the companj; and if they can not agree, or the municipal authorities unreasonably delay to enter into any agreement, the probate court of the county, in a proceeding institued for the purpose, shall direct in what mode such telegraph line shall be constructed along such street, alley, or public way, so as not to incommode the public in the use of the same; but nothing in this section shall be so construed as to authorize any municipal corporation to demand or receive any compensation for the use of a street, alley, or public way, beyond what may be necessary to restore the pavement to its former state of useful-‘^j'-ness.” This is practically a provision for an appropriation proceeding against the municipality, and it is the only proceeding of that nature that is necessary against the municipal body in order to enable the company to make the needed uses of its streets. It will be noticed that it is not the right to use the streets that is made, the subject of agreement between the company and the municipal authorities, or of determination by the *81 court. That right, as has been seen, is granted to the company directly by the legislature, and it is not made to depend upon any consent or agreement on the part of the municipality. It is only the mode of such use that becomes the subject of agreement or judicial determination. The power of eminent domain residing in the state, it has been held, under our present constitution, is committed to the control of the general assembly by the grant of legislative power, and it may-be exercised by that body directly, or by agencies like private corporations, in such manner, under such conditions, and through such tribunals having capacity to receive the jurisdiction, as may be, by legislative enactment provided; subject, however, to the constitutional requirement that the property taken be for a public use, and to the constitutional guaranty of compensation for private property so taken. A municipal corporation, though holding the fee in its streets, has no private proprietary right or,, interest in them which entitles it to compensation, under the constitution, when they are subjected to an authorized additional burden of a public nature. Lewis on Eminent Do' main, section 119. Being charged with a public duty only, with respect to the streets under its control, including that of keeping them in repair, the compensation it is allowed to demand or receive for the use of its streets by a telephone company is expressly limited, by the provision of the statute under consideration, to “what may be necessary to restore the pavement to its former state of usefulness,” where it is disturbed in the construction of the company’s lines. This compensation not being for any private property taken, may, without interfering with any constitutional restraint, be assessed by the court, without a *82 jury. Nor can there by any doubt that the use of property, and of highways, for the legitimate purposes of a telephone or telegraph company, is a public use within the purview of the. constitution, nor, that the occupation of streets for those uses is consistent with their original design. Indeed such companies have become indispensable business and social agencies, which materially relieve the public highways from use by the ordinary methods of travel, thus contributing to their convenience and safety. The statute contemplates that if the mode of using the public ways of cities and villages by telephone companies were left entirely to agreement between the council and company, the franchise of the latter might be made unavailable by the refusal of the former to negotiate with the latter, or by bona fide disagreement of the parties, a contingency not unlikely to occur; and hence, the necessity for the provision of section 3461, now in question, by which jurisdiction is conferred on a competent court to determine the mode of such use by an order binding on both parties. Whether that provision be considered as strictly a part of the system established for making appropriations by such companies under the power of eminent domain, or as incidental and auxiliary thereto, it calls for the exercise of judicial functions of the same general nature.
The contention of those who contest the constitutionality of this statutory provision is, that the proceeding authorized by it, though not nominally so, is in reality, an appeal from the action of the municipal council, a purely legislative body, the purpose of which is to invoke the exercise of powers by the court, of the same legislative character as those that have been exercised by, and properly pertain to, the *83 council. This is an incorrect view of the statute. The proceeding is not an appeal from the council, either in substance or form. An appeal is the removal of a cause or matter from an inferior jurisdiction after its decision, to a superior jurisdiction for re-trial on its merits; and, a proceeding in a superior jurisdiction cannot, with any propriety, be called an appeal where the cause or matter involved was not before any inferior tribunal or body. No action of the council, nor any matter within its cognizance, is brought before the probate court, by the proceeding therein under the statute, for review or reconsideration. The council is given no power to direct in what mode the lines of a telephone company shall be constructed in the streets of the municipality. Its sole province is to come to an agreement with the company in regard to the mode of using the streets by the company. The making of such agreement between the parties is not involved in the proceeding instituted in the court, nor is its action in that regard in any way invoked. The jurisdiction conferred on the court is to determine the controversy between the disputant corporations, arising from their disagreement or failure to agree, by an order binding on both, directing in what mode the telephone lines shall be constructed in the streets and alleys, so as not to incommode the public in the use of the same. The method of calling this jurisdiction into exercise is not by appeal, and could not be so, for the reason already given, but, in the language of statute, is by an original “proceeding instituted for that purpose.” The institution and prosecution of a legal proceeding in a court, plainly comprehends the filing of a proper complaint, process for bringing the necessary parties into court, and judicial inquiry ac *84 cording to the usual rules and practice of courts. And this fact, alone, of conferring on a judicial tribunal in the first instance the power to act in a given matter, is of controlling importance in giving judicial character to the nature of the poAver; though that is not necessarily a conclusive test, for if it were, the existence of a statute would establish its validity ; but it is decisive, in that respect, unless it is reasonably certain that the power belongs exclusively to the legislative or executive department. This court, in State v. Harmon, 31 Ohio St., 250, 259, approved of that principle, as stated by Selden, J., in Cooper’s case, 22 N. Y., 84, as folloAvs: “The principle * * * obviously is, that where any poAver is conferred upon a court of justice, to be exe’rcised by it as a court, in the manner and Avith the formalities used in its ordinary proceedings, the action of such court is to be regarded as judicial, irrespective of the original nature of the poAver. The legislature, by conferring any particular poAver upon a court, virtually declares that it considers it a power which may be most appropriately exercised under the modes and forms of judicial proceedings.”
In this important feature our statute is the opposite of the- Connecticut statute Avhich was held unconstitutional by the Supreme Court of that state in the Appeal of the Norwalk St. Ry. Co., decided July 13, 1897, and reported in the 69 Conn., 576, and in 37 Atlantic Rep., 1080, which is cited, and chiefly relied on by the plaintiff in error to sustain its position with respect to the invalidity of our statute. The statutory provisions considered in that case are embraced in two sections, one of'which Avas passed in 1893, and the other in 1895. The former provides that when any *85 street railway company desires to lay its tracks, or any additional tracks, in the streets of any city, town, or borough, it shall make and submit a plan for laying its tracks, etc., to the mayor and common council of the city, the selectmen of the town, or warden or burgesses of the borough, who may adopt the same, or “make such modifications therein as they deem properand, that “no such company shall construct such railway or lay additional tracks” in the streets of such city, town, or borough, except in accordance with a plan approved by such local authorities. The section contains the further provision,' that “the refusal or neglect of any such local authority to notify said company of its decision (on the company’s application, within a specified time) shall be deemed to be a refusal to approve and accept said plan as presented by said company.” The section adopted in 1895, provides that, when the local authorities named in the former section, shall make or render any decision or order with respect to any matter relating to any street railway within their jurisdiction, the company may appeal therefrom to the superior court, or a judge thereof, “and said court or judge shall make such order in reference to said matter appealed from, as may by it or him be deemed equitable in the premises.” Then follows the further provision that, whenever the local authorities named in tlie act of 1893, above referred to, shall thereunder, “be deemed to have refused to approve or accept any plan presented by any street railway company, said street railway company shall have a like right of appeal therefrom to said superior court or any judge thereof ; ■ and said court or judge shall have the same powers with reference to said plan and the acceptance or modification thereof that said municipal *86 authorities would have had under the provisions of said act, and may make all such orders with reference thereto as may be deemed equitable.” Perhaps it may aid somewhat in arriving at a clearer understanding of the decision in the Connecticut case referred to, to notice here that the act of 1895 provides for appeals in two distinct classes of cases, and that the' powers conferred on the court or judge by the respective appeals, are somewhat different. It first provides for appeals from any order or decision made or rendered by the municipal authorities, on the railway company’s application, and the power conferred on the court or judge in that class of cases is simply to make such order in the matter so appealed from as the court or judge may deem equitable; then it makes separate provision for appeals from the neglect or refusal of the municipal authorities to act upon the application of the railway company within the required time, and, in cases of that kind it is provided that the court or judge “shall have the same powers that the municipal authorities would have had” under the statute of 1893. It is this last provision, and that alone, by which it was attempted to confer on the court or judge, all the powers of the municipal council, that, in the opinion of the Supreme Court of Connecticut, made the functions of the appellate court or judge so essentially and distinctively legislative as to render that provision invalid.
The other provisions of the statute, including that providing for appeals in the other class of cases, that is, from orders and decisions made and rendered by the council, in regard to which, as above shown, the statute does not purport to confer on the appellate court or judge the powers of the council, but limits the *87 jurisdiction to the making of such orders as shall be deemed equitable, were held valid, and an appeal of that kind sustained, in the Central Railway & Electric Co’s Appeal, reported in 67 Conn., 197. This case was not overruled by the later case of the Nor-walk Co’s Appeal, supra, but was distinguished. In that part of the opinion in the last case which, distinguishes the former one, the provision of the statute for appeals from orders and decisions of the municipal council, and the power thereby conferred on the court or judge, are referred to as follows: “The act of 1895, provided, among other things, that an aggrieved person might appeal from an order made by a municipal council in pursuance of the act of 1893; that such appeal should be by petition to the court, which should specifically state the portion of the order appealed from, and the reasons, and be served on the council, and that such appeal should be tried by the court, and appropriate judgment rendered.” Then, the learned judge, after giving the reasons for sustaining that provision of the statute and the appeal taken under it in the former case, proceeds to state the difference in the provision in question authorizing appeals when there is a refusal of the council to act, and in the nature of the power it purports to confer on the appellate court or judge, as follows: “But the act of 1895 goes further, and contains an additional provision, which is not fairly susceptible of being construed as merely providing for a process to bring into action the judicial power of the court, and which, without any action by a municipal council other than a failure to act within a limited time, purports to transfer to the court all the powers conferred on municipal councils by the act of 1893. The *88 distinction between the two provisions of the act is vital.” So that, the real ground of that decision, holding invalid the statutory provision there in question, is that its purpose was to transfer to the appellate tribunal, to be exercised by it, all the legislative and administrative powers of the municipal council over the subject-matter of the appeal. That principle has no application to our statute; for, as has been here: tofore shoAvn, the proceeding authorized by it is in no sense a substitution of the court for the municipal council, nor in the nature of an appeal from that body, nor does it transfer to the court, to be exercised by it, any poAver primarily conferred on that body, nor purport to do so. And, furthermore, Avhether the distinction made in the Connecticut case between the different proAnsions of the statute there considered be substantial or not, it is clear the proceeding under each provision is strictly an appeal, in the appropriate sense of that term, from a legislative body, on matters originally committed to it, AArhich, of itself, is a feature of controlling influence in fixing the legislative character of the power conferred, and which is AAdiolly lacking in our statute.
The reasonable limits of an opinion, already enlarged, AA'ill not permit a revieAV of all the cases cited by counsel for the plaintiff in error. We have carefully examined them all, and find none of them more directly in point than the one just noticed, and none, Ave believe, are claimed to be so.
“It is certainly clear as a general rule,” says Selden, J., in Cooper’s case, supra, “that whenever the law confers a right, and authorizes an application to a court of justice to enforce that right, the proceedings upon such an application are to be regarded as of a judicial nature.” It is competent for the state, *89 through its legislative department, to grant to telephone and telegraph companies organized under its authority, the right to construct their lines in the streets of municipalities, and in the present instance the grant was so made. The inability or failure of the council to come to an agreement with the company in regard to the mode of using the streets for that purpose, practically amounts to a denial of the company’s right, the remedy for the enforcement of which is that provided by section 3461 of the Revised Statutes. The administration of that remedy does not involve the exercise of any continuing supervisory powers over the municipal, or telephone corporation, nor the adoption or execution of administrative regulations for the government of either, but consists of an order made by the court in the usual manner of legal proceedings, after a hearing of the allegations and evidence of parties who are brought before the court by proper process.
It is necessary, no doubt, to' specify in the order, with reasonable certainty, the mode of construction of the company’s lines so that they will not incommode the public in the use of the streets; and, it is true that an order of that nature can only be performed, or its execution enforced in the future. But, while orders of that description may be infrequent, they are not unknown to the courts. In Pennsylvania v. The Wheeling Bridge Co., 13 How. (U. S.), 518, 626, the court, after the examination of plans submitted, and the hearing of expert and other evidence, entered its order directing the defendant to so change the construction of its bridge over the Ohio river, according to certain detailed plans and specifications therein set forth, as not to obstruct the navigation of the river. And other instances of like *90 orders and decrees of courts may be found in the books. The ca'se of the Canada Northern R’y v. International Bridge Co., 7 Fed. Rep., 653, was a proceeding in a federal court under an act of congress which “authorized the construction and maintenance of a bridge across the Niagara river by the International Bridge Company, and provided that ‘all railway companies desiring to use said bridge shall have and be entitled to equal rights and privileges in the passage of the same, and in the use of the machinery and fixtures thereof, and of all the appurtenances thereto, under and upon such terms and conditions as shall be prescribed by the district court of the United States for the northern district of New York, upon hearing the allegations and proofs of the parties, in case they shall not agree.’ The Canada Southern Railway Company subsequently presented their petition under this act to the district court of the United States for the northern district of New York, and alleging that it had never been able to agree with the International Bridge Company upon the amount of compensation which it should pay for the use of such bridge, prayed the court to determine and prescribe the terms and conditions upon which it might use the said bridge, together with the machinery, fixtures and approaches.” The jurisdiction of the court was called in question on the ground that the power which the statute attempted to confer on the court was legislative, and not judicial. But the court held, that: “A determination by a court, under the authority of a statutory enactment, in a case of disagreement, of the terms and conditions upon which a railway company should be entitled to the use of a bridge and its appurtenances, after hearing the allegations and proofs of the parties, is not an improper exercise of *91 the judicial functions; that it is no less the exercise of a judicial function to prescribe a rule of conduct, or protect the exercise of a right during a future period, than it is to determine whether the right has been invaded in the past ; and that, when a statute refers the question of the conditions upon which an easement shall be enjoyed to a judicial tribunal for decision, after hearing the proofs and allegations of the parties, the implication is cogent that the decision shall proceed upon settled principles of law and equity, and not upon arbitrary discretion.”
The necesá^ for the existence of some tribunal authorized to hear and determine disagreements between municipalities and telephone companies with respect to the mode of construction of the companies’ lines in the public streets, is apparent, not only for the protection of the rights of the respective corporations, but also in the public interest, as conservative of peace and good order, and in securing to the public the full benefit of the service such companies are designed to afford, at those reasonable rates which always attend fair competition. And the best consideration we have been able to give this case has failed to satisfy us that the power conferred on the probate court by the statutory provision in question has been inappropriately bestowed. The argument to the contrary, thorough and able as it has been, at most has served to east a doubt upon the validity of the provision, but that is not enough to justify the court in holding it unconstitutional. The judgment is therefore

Affirmed.

Buricet, Spear and Davis, JJ., concur.
Shauck, C. J., and Minshall, J., dissent.